## KEYSTONE STRUCTURAL CO. v. LINK-BELT CO.

(Circuit Court of Appeals, Third Circuit. February 9, 1921. Petition for Rehearing Dismissed March 9, 1921.)

No. 2592.

Contracts ⊂⇒22 (1)—Contract for building bridge held binding after performance.

As a preliminary to bidding on construction work for a railroad company, which included a steel bridge to be 193 feet or 243 feet long, as the railroad company might determine, defendant asked plaintiff for an estimate on the bridge, to include both material and work, submitting a drawing for a bridge 193 feet long, but without specification of material, and plaintiff submitted an offer at a named price for 100 pounds of steel used. Later defendant furnished plaintiff with detail sheets, specifying the material, without a drawing, but which disclosed a bridge of 243 feet span, and a corresponding quantity of steel. Afterward the contract was closed on the basis of the offer. Plaintiff built the bridge and received payment at the contract price per unit of steel. *Held*, that it could not thereafter claim that there was no contract for the bridge, which it in fact built, and recover therefor on a quantum meruit.

In Error to the District Court of the United States for the Eastern District of Pennsylvania; Oliver B. Dickinson, Judge.

Action at law by the Keystone Structural Company against the Link-Belt Company. Judgment for defendant, and plaintiff brings error. Affirmed, and petition for rehearing dismissed.

For opinion below, see 265 Fed. 320.

M. Hampton Todd, of Philadelphia, Pa., for plaintiff in error.

Joseph Carson, John Kent Kane, and Hampton L. Carson, all of Philadelphia, Pa., for defendant in error.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

WOOLLEY, Circuit Judge. All agree that the parties thought they had entered into an express contract for the erection of a bridge. The plaintiff undertook to supply the material and do the work of construction and the defendant to pay for the same at a named price per 100 pounds of steel used. The plaintiff built a bridge and the defendant paid for a bridge. Later, the plaintiff found, as it claims, that the bridge it built was not the bridge it had contracted to build. On the assumption that the bridge it built was not covered by the contract, the plaintiff brought this action of indebitatus assumpsit to recover for the bridge at a price per unit substantially higher than that named in the contract. The trial court directed a verdict for the defendant and the plaintiff sued out this writ of error.

As the main facts of this novel controversy are not in dispute, we find it necessary to state them with particularity and at some length in order correctly to draw from them the inferences on which the decision rests.

The case made by the plaintiff was as follows:

The defendant was in negotiation with the Lake Champlain & Moriah Railway Company for the erection, at Port Henry, New York, of an

---

⊂⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

ore-handling bridge tramway of 193 feet span containing about 190 tons of structural steel or of 243 feet span containing about 290 tons, as the railway company should later determine. In order to fix the amount of the bid it proposed to make for a bridge of either size, a representative of the defendant in a personal interview with a representative of the plaintiff asked the latter concern for quotations per pound or per unit of 100 pounds of structural steel (covering both labor and material) on a plan which it submitted, showing a bridge of 193 feet span but without specifications or details. By its letters of December 28 and 31, 1915, the plaintiff, referring by identification number to the plans submitted, quoted a price of 4.95 cents per pound. Thereupon the defendant made its bid to the railway company and on January 19, 1916, it was awarded a contract for the bridge, the dimension, whether the short or long span, remaining open for determination by the railway company. Pending the railway company's decision on this point, the defendant closed the contract with the plaintiff by letter of its agent, dated February 8, 1916, informally written at its Philadelphia office, and by letter of March 7, 1916, written at its home office in Chicago, formally accepting the quoted price. In the letter of the latter date the defendant directed the plaintiff "to furnish all necessary labor, tools, for the delivery and erection at Port Henry, New York, the structural steel necessary for one ore-tramway as per detail drawings and bills of material which we will furnish." Later, the defendant sent the detail drawings and bills of material to the plaintiff's plant. These did not show a bridge of 193 feet span according to the plan previously submitted but called for a bridge of 243 feet span. Pursuant therewith, the plaintiff corporation—its office force being ignorant of this disclosure—fabricated the steel, shipped it to Port Henry and erected the bridge. Not until it had finished the bridge, made delivery and received final payment did the plaintiff find that the bridge it had built was different from and larger than the bridge covered by the contract into which it regarded itself as having entered.

On these facts, when read in colorless outline, there would seem to be substance in the plaintiff's contention that the minds of the parties had never met, or that the bridge contracted for was not built, that the bridge built was not contracted for, and that, accordingly, recovery therefor might validly be had on an implied contract in an amount to be found on the quantum meruit. Tucker v. Preston, 60 Vt. 473, 11 Atl. 726.

When the defendant came to its defense it did not dispute these facts, but supplemented them with other facts, which, taken together, constituted the case as made by the defendant. It was as follows:

In closing the contract by accepting the plaintiff's offer to build a bridge at the price quoted, the defendant by its letter of March 7, 1916, concluded:

"All as per your quotations of 12—28—15 and 12—31—15 and letter from our Philadelphia Plant dated 2—8—16"

—restating the quoted price as $4.95 per 100 pounds, delivered and erected, and giving for the first time terms of payment as:

"50% cash when all material is delivered, 25% cash when erection is complete, and balance (25%) upon acceptance."

The importance of the cited letters to the present discussion is that in the plaintiff's letter of December 28, which contains the first quotation of price, reference was made by plan number to the defendant's drawing of a bridge of 193 feet span. At that time, it may be, the plaintiff's price was made with reference to a bridge of that dimension. In the letter of February 8, 1916, last referred to, the defendant, pursuant to a previous conversation, enclosed eighteen listed sheets showing the structural steel work for the proposed bridge and instructed the plaintiff "to take these sheets as (its) authority for proceeding with the work," evidently chancing the decision of the railway company on the size of the bridge it had yet to make. In this letter the defendant further stated that "the list covers from 85 to 95% of the structural steel required for the order, which, together with about 10,000 pounds of plates * * * all constitute the greater part of the steel to be used in connection with this order," concluding that, "as soon as we have the accurate drawings and regular bills of material from Chicago, we will be glad to forward these to you for your attention."

It is in testimony that these listed sheets comprised the "Specification for Estimate" on the bridge with reference to which the parties were negotiating, and that the beams, rails and shapes there specified, considered with reference to their number and dimensions, disclosed to anyone familiar with such matters that the bridge for which the estimate had been asked was of 243 feet span and corresponding weight. It therefore appears that before the defendant's letter of March 7, 1916, finally accepting the plaintiff's price and formally closing the contract, there were in the hands of the plaintiff, first, a drawing without detail specifications showing a bridge of 193 feet span and a weight of about 190 tons and, second, listed sheets without a drawing, which, read in connection with the letter of February 8, showed specifications for a bridge of 243 feet span calling for more than 250 tons of steel.

Thus upon the closing of the contract there might have arisen a question whether the minds of the parties had met on the construction of a bridge of the dimension shown by the drawing or a bridge of the dimension shown by the listed sheets. If matters had stopped here and this question had arisen in litigation, concededly it would have been one for a jury. But the transaction went on.

Without further correspondence concerning the terms of the contract, the plaintiff, evidently regarding the contract as closed by the defendant's letter of March 7, set about its performance. It requested the defendant to send the detail drawings and bills of material, promised in that letter, direct to its fabricating plant at Royersford. These the defendant forwarded as requested. For this reason they failed to pass through the plaintiff's Philadelphia office. The detail drawings showed, as we have already said, a bridge of 243 feet span and the bills of material called for a corresponding tonnage of steel.

In sending plans and bills of material for the larger bridge instead of for the smaller one, the defendant is not charged with fraud. Yet there is the fact. With full knowledge of this fact,—not at its office in Phil-

adelphia, it is claimed, but at its works in Royersford,—the plaintiff corporation proceeded to manufacture steel in the shapes and in the quantity required for the larger bridge. After it had delivered all material upon the premises at Port Henry as called for by the contract, amounting to 583,174 pounds or 291 tons, the plaintiff presented to the defendant a bill, expressly referring to the contract by its identifying number and calling for payment at the contract price of $4.95 per 100 pounds for one-half the price of the full tonnage, as provided by the contract terms of payment. The defendant paid the bill. The plaintiff then set about the erection of the bridge. On its completion it sent the defendant a bill for the balance of the contract price. This also the defendant paid; the plaintiff, on accepting the money, raising no question as to the identity of the bridge with that of the contract. After the bridge had been built and paid for, the plaintiff discovered, it maintains, that the bridge it built was not the bridge it had contracted to build, and that, having built and delivered a bridge not under the express contract, it brought this action on an implied contract, demanding of the defendant payment for the bridge at a market rate of $9.00 per 100 pounds of steel.

At the trial the learned judge found a contract between the parties and construed it as contemplating a bridge of the smaller span and smaller tonnage, but held that the price, being based on units of material estimated, extended to and embraced all units of material afterwards added. Under this construction the defendant had paid the contract price in full, therefore the learned trial judge directed a verdict in its favor. As this interpretation involves a construction of a business practice in the bridge building industry of quoting prices on an unit basis in a case in which we regard that practice to have been discussed in the evidence with doubtful sufficiency, we prefer to sustain his decision on another ground fully warranted, we think, by evidence relating to this particular transaction.

As we have said before, there might at one time have arisen a question whether the minds of the parties had met as to the size of the bridge to be built under the contract, whether a bridge of the smaller dimension as shown by the plan of a bridge without specifications as to material, or a bridge of larger dimension as shown by the listed sheets specifying materials without a plan, both being in the plaintiff's possession before the contract was closed. If the case had at that time come to trial, we say again, this question would have been for the jury to determine; but since that time, we think, the plaintiff has itself determined the question.

To review, at the risk of repetition, the plaintiff's part in these transactions, we assume that at first the parties contemplated a bridge of the smaller dimension. Yet later there were before the plaintiff data of bridges of both dimensions. With such data in its hands the plaintiff closed the contract and began work. Admittedly both parties had dealings with reference to a bridge of a span of 243 feet. Both parties knew or were charged with knowledge of the amount of material it would take to build a bridge of such dimension. The plaintiff fabricated and delivered upon the premises all material for a bridge of that

size, rendered a bill for one-half of its price as the contract provided, and received payment at the contract rate. It then erected the bridge of the larger size and on its completion rendered a bill for the balance due at the contract price. On payment of the latter bill the plaintiff delivered the bridge of larger size and the defendant accepted it, no one intimating that the bridge so built, paid for, delivered, and accepted was not the one covered by the contract. Such being the plaintiff's conduct, we regard it as interpretative of its understanding of the contract. As its understanding corresponds with the understanding of the defendant, we do not think that the plaintiff can now be heard to say, or that a jury can now be allowed to decide, that the bridge it built was erected under no contract at all, and that, in consequence, it has a right to recover payment at a price found on the quantum meruit.

The judgment below is affirmed.

### On Petition for Rehearing.

PER CURIAM. The writer of this opinion confesses error in the statement that upon the completion of the bridge of larger size the plaintiff "rendered a bill for the balance due at the contract price." It is literally true, so far as the testimony shows and as the plaintiff says in its petition for rehearing, that "no such bill was rendered." What the plaintiff did, however, was in effect the same as rendering a bill. With a regard to a more precise statement of the evidence, we give the facts:

By letter of October 16, 1917, the plaintiff informed the defendant that the bridge would be completed a week hence and asked it to "note that *further* payments will then be due *on our contract with you for this work.*" A difference having arisen as to minor matters, among which was the percentage of the balance then payable, the plaintiff, by letter of November 7, 1917, asked the defendant also to "note that *the terms of the contract* made the erection and acceptance contemporaneous events and since we hold certificate of acceptance then the full 50% of claim *presented* is now due"; threatening that, "unless we have check for *this amount,* less such just claims that you have against us, in our hands by the morning of the 12th inst., then we will instruct our attorney to proceed at once in a proper legal way to make this collection." By letter of November 21, 1917, the defendant remitted in full what it considered to be the balance due at the contract price and by receipt of November 28, 1917, the plaintiff acknowledged payment; each reserving the right to make claims against the other respecting matters which did not, so far as the evidence shows, relate to the difference in the size of the bridge here in controversy.

Although there is testimony that it was in October, 1917, that certain officers of the plaintiff company first discovered the size of the bridge constructed, and that in the same month they consulted counsel about it, there is no evidence that the plaintiff disclosed its discovery to the defendant or made any claim based on it until after payment had been demanded and made at the contract rate in the month of November.

The petition for rehearing is dismissed.